# United States Court of Appeals

## For the Eleventh Circuit

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 17 2009

JAMES N. HATTEN, CLERK
Deputy Clerk

No. 08-10508

District Court Docket No.
06-00323-CR-1-1

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Feb 3, 2009

THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSE FARIAS-GONZALEZ,

Defendant-Appellant.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

----------------------------------------------------------------

Appeal from the United States District Court
for the Northern District of Georgia

----------------------------------------------------------------

## JUDGMENT

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

ISSUED AS MANDATE

MAR 04 2009

U.S. COURT OF APPEALS
ATLANTA, GA.

Entered:      February 3, 2009
For the Court:   Thomas K. Kahn, Clerk
        By:   Gilman, Nancy

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

[PUBLISH]

MAR 17 2009

JAMES N. HATTEN, CLERK
By: _____ Deputy Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 03, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-10508

_____

D.C. Docket No. 06-00323 CR-1-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSE FARIAS-GONZALEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(February 3, 2009)**

Before BLACK, PRYOR and COX, Circuit Judges.

COX, Circuit Judge:

The principal issue in this appeal is whether evidence of who the defendant is

("identity-related evidence"), obtained after an unconstitutional search and seizure,

is suppressible in a criminal prosecution.  We conclude that, under the cost-benefit

balancing test used by the Supreme Court in *Hudson v. Michigan*, 547 U.S. 586, 126 S. Ct. 2159 (2006), identity-related evidence is not suppressible when offered in a criminal prosecution only to prove who the defendant is.

## I. BACKGROUND

In 2006, two Immigration and Customs Enforcement special agents were patrolling apartment complexes in metro-Atlanta for possible gang activity. (R.1-28 at 2.) The agents saw a man working on his car. Believing the man's tattoos and haircut to be similar to those of Hispanic gang members, the agents parked their car beside his, between five and ten feet away. (R.1-28 at 3.) The agents were dressed in plain clothes, but a gun was visible on one agent's belt. (R.1-28 at 3.) The agents showed a police badge and identified themselves as police, and then asked the man if he was affiliated with any gangs. (R.1-28 at 3-4.) After he told the agents he was not, the agents looked more carefully at his tattoos, and one of the agents lifted the man's shirt sleeve to determine if he had any tattoos on his upper arm. (R.1-28 at 4.) The agents then asked the man for his identification. He told them that his identification was inside his apartment and asked if he could go get it. One of the agents asked if they could go with him for safety reasons, and the man agreed. (R.1-28 at 4.)

2

Once inside the apartment, the man produced a Mexican voter registration card, a Mexican driver's license, and a Tennessee driver's license, all of which identified the man as Norberto Gonzalez. (R.1-28 at 4-5, R.2 at 15.) The agents then asked a series of questions to determine if the man was in the United States legally. (R.1-28 at 5.) The agents suspected he was in the country illegally based on his answers and asked him to take off his shirt so they could take pictures of his tattoos, and he agreed. (R.1-28 at 5-6.) After taking pictures, the agents and the man went back outside the apartment, and he said he had been to prison before. (R.1-28 at 6.) One agent also testified that he had called a law enforcement support center to check the name and date of birth on the identification the man had given them, and no records came back associated with that name. (R.1-28 at 7.) Both agents concluded at this point that the man might have come into the country illegally. (*Id.*)

Having concluded the man might be in the country illegally, the agents took his fingerprints on a portable electronic fingerprint machine. (*Id.*) The fingerprints showed that the man's real name was Jose Farias-Gonzalez and that he had previously been deported from the United States. (R.1-28 at 7-8.) The agents then arrested Farias-Gonzalez, took him to the police station, advised him of his *Miranda* rights, and processed him. (R.1-28 at 8.)

3

As part of the processing procedure, the agents took Farias-Gonzalez's fingerprints again and took down more detailed biographical data. (R.3 at 58.)

Farias-Gonzalez was charged with illegally reentering the country after deportation in violation of 8 U.S.C. § 1326. He pled not guilty. He filed a motion to suppress, contending that the agents engaged in a constitutionally unreasonable search and seizure which began when they lifted his shirt sleeve. Accordingly, Farias-Gonzalez sought to suppress all evidence obtained as a result of the unconstitutional search and seizure. (R.1-21 at 7.) He argued that this initial search, combined with the presence of a holstered gun in plain sight, made his expressions of consent during the rest of the encounter merely statements of "acquiescence to a show of official authority" and not, therefore, voluntary. (R.1-21 at 15-16.) Additionally, he contended that the agents had subjected him to a custodial interrogation without giving him a *Miranda* warning. (R.1-21 at 19.)

After conducting an evidentiary hearing, the magistrate judge issued a report recommending that the district court deny the motion to suppress since there was no Fourth Amendment violation. (R.1-28 at 18.) In particular, the magistrate judge reasoned that Farias-Gonzalez had no expectation of privacy in any potential tattoos under his shirt sleeve since he had exposed tattoos. (R.1-28 at 13-14.) His consent to the rest of the agents' questioning and search eliminated any potential Fourth

4

Amendment violation. (R.1-28 at 15-18.) Additionally, the magistrate judge

concluded that there was no evidence in the record that the agents prevented Farias-

Gonzalez from leaving the area or that he did not feel free to leave. (R.1-28 at 14.)

Finally, the magistrate judge found nothing in the record which suggested that Farias-

Gonzalez's multiple expressions of consent during the encounter were coerced. (R.1-

28 at 15-18.) Because the magistrate judge concluded that there had been no seizure,

*Miranda* warnings were not necessary. (R.1-28 at 17-18.)

Farias-Gonzalez objected to the magistrate judge's report and recommendation

and the district court heard oral argument on the objections. As required under 28

U.S.C. § 636(b)(1), the district judge conducted a de novo review of the record,

reviewing the transcripts of the suppression hearings in ruling on the objections.[1] The

district judge then entered an order granting in part and denying in part the motion to

suppress. The district judge stated that he did not make any new factual findings in

his order, and referred to the magistrate judge's report for a "fully detailed" account

---

[1] A district court makes a de novo determination of those portions of a magistrate's report
to which objections are filed. 28 U.S.C. § 636(b)(1). A de novo determination, however, does not
mean that a district court must make a de novo examination of the witnesses. *Calderon v. Waco
Lighthouse for the Blind*, 630 F.2d 352, 356 (5th Cir. 1980). Rather, that review is a de novo review
of the record. *In re Holywell Corp.*, 967 F.2d 568, 571 (11th Cir. 1992); *cf. Archambault v. United
Computing Sys., Inc.*, 695 F.2d 551, 551 (11th Cir. 1983) (clear error review for findings of
magistrate judge sitting as special master); *United States v. Cofield*, 272 F.3d 1303, 1306 (11th Cir.
2001) (district court required to rehear disputed testimony before rejecting magistrate judge's
findings based on credibility of witnesses).

of the relevant facts. (R.1-36 at 1.) The district court held that Farias-Gonzalez had

a reasonable expectation of privacy in the areas of his body covered by clothing, and

thus the agent's lifting of his shirt sleeve was an unreasonable search under the

Fourth Amendment. (R.1-36 at 2.) The court held that the sight of the special agent's

gun, the position of the special agents between Farias-Gonzalez and his apartment,

and the unreasonable search of his upper arm would have made a reasonable person

in Farias-Gonzalez's position feel that he was not free to leave. (R.1-36 at 3-4.)

Accordingly, the court held, an unreasonable seizure occurred at the outset of the

encounter. (R.1-36 at 4.) The court reasoned that because so little time had passed

between the unconstitutional search and seizure and Farias-Gonzalez's repeated

expressions of consent, the Government did not adequately prove that the consent

was voluntary and free from the taint of the initial Fourth Amendment violations.

(R.1-36 at 4-5.) Because there was a seizure, the court also found that a *Miranda*

warning should have been given. (R.1-36 at 5.) Having found that the agents

engaged in an unconstitutional search and seizure, the court ordered that all evidence

obtained as a result of the unconstitutional search and seizure be suppressed except

for fingerprint evidence, photographs of Farias-Gonzalez, and the alien file[2] of Farias-

---

[2]An alien file contains information on each time an alien has passed through the U.S.
immigration and inspection process. Accordingly, an alien file will have evidence of prior
deportations from, or lawful entries into, the United States. Additionally, the alien file contains the

Gonzalez. (R.1-36 at 6-7.) The court held that "identifying information obtained as a result of an unlawful arrest is not subject to suppression, even in an evidentiary context," relying on *INS v. Lopez-Mendoza*, 468 U.S. 1032, 104 S. Ct. 3479 (1984), and opinions from the Third, Sixth, Fifth, and Ninth Circuits construing *Lopez-Mendoza*.[3] (R.1-36 at 6.)

Farias-Gonzalez then entered a conditional guilty plea, reserving his right to challenge the court's denial of his motion to suppress. He is currently in prison serving his sentence, and now appeals his conviction.

## II. ISSUES ON APPEAL AND CONTENTIONS OF THE PARTIES

Farias-Gonzalez argues that the district court erred in denying in part his motion to suppress the evidence obtained as a result of the unreasonable search and seizure because *Lopez-Mendoza* is inapposite. Specifically, Farias-Gonzalez argues that *Lopez-Mendoza* applies only to challenges to a court's jurisdiction, and that *Davis v. Mississippi*, 394 U.S. 721, 89 S. Ct. 1394 (1969), and *Hayes v. Florida*, 470

---

alien's fingerprints and photograph.

[3]*United States v. Bowley*, 435 F.3d 426 (3rd Cir. 2006), *United States v. Navarro-Diaz*, 420 F.3d 581 (6th Cir. 2005), *United States v. Roque-Villanueva*, 175 F.3d 345 (5th Cir. 1999), and *United States v. Guzman-Bruno*, 27 F.3d 420 (9th Cir. 1994) all held that identity-related evidence is not suppressible.

U.S. 811, 105 S. Ct. 1643 (1985), compel suppression of the fingerprints, photographs, and alien file.[4]

The Government contends that identity-related evidence is never suppressible, and cites *Lopez-Mendoza* in support. The Government argues that, even if *Lopez-Mendoza* does not control, the exclusionary rule should not be applied to identity-related evidence because the social cost of doing so is too high. Finally, the Government argues that prior precedent in this circuit precludes suppression in this case of the alien file. The Government contends, in the alternative, that we should affirm on the ground that there was no Fourth Amendment violation.

### III. STANDARD OF REVIEW

"In reviewing a district court's denial of a motion to suppress, we review the findings of fact for clear error and the application of law to those facts *de novo*." *United States v. Mercer*, 541 F.3d 1070, 1073-74 (11th Cir. 2008) (citation omitted).

### IV. DISCUSSION

A. Constitutional Violations

We first consider the Government's alternative argument, that there was no Fourth Amendment violation to trigger the application of the exclusionary rule.

---

[4]In *Hayes* and *Davis*, the fingerprints were taken to connect the defendants to serious, non-identity related crimes. Here, Farias-Gonzalez's fingerprints were used only as evidence of identity.

Although we have reservations about the district court's finding that Farias-Gonzalez's consent was involuntary, we need not address this argument since we ultimately agree with the district court that the exclusionary rule does not apply to the photographs, fingerprints, and alien file in this case. We assume *arguendo*, therefore, that the district court's finding of a Fourth Amendment violation was correct.

### B.  The Exclusionary Rule and Identity-Related Evidence

The district court refused to exclude the photographs and fingerprint evidence of Farias-Gonzalez's identity because it concluded that *Lopez-Mendoza* held that identity was never suppressible, even in an evidentiary context.  Farias-Gonzalez contends that *Lopez-Mendoza* does not control, as its pronouncement that "identity is never suppressible" is dictum because the Court was addressing a jurisdictional challenge to a civil deportation hearing.  We agree.

In *Lopez-Mendoza*, the defendant in a civil deportation hearing moved to terminate the hearing because he had been arrested illegally.  468 U.S. 1032, 1035, 104 S. Ct. 3479, 3481.  The Court noted that the defendant was not challenging any evidence offered against him, but rather was objecting to being summoned to a deportation hearing.  In holding that a defendant could not use the exclusionary rule to avoid being summoned to a deportation hearing, the Court wrote, "The 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself

9

suppressible as a fruit of an unlawful arrest." *Id.* at 1039, 104 S. Ct. at 3483. But, the Court's analysis carefully distinguished the civil nature of a deportation hearing from a criminal prosecution. *Id.* at 1038-39, 104 S. Ct. at 3483. Because the Court was not addressing an evidentiary challenge in a criminal prosecution when it pronounced that identity was never suppressible, we conclude that *Lopez-Mendoza* does not support a holding that identity-related evidence is never suppressible, and thus does not control this case.[5]

The Government argues that, even if *Lopez-Mendoza* does not control, the exclusionary rule should not apply to the photograph and fingerprint evidence in this case because the policy rationale of the exclusionary rule is not well served by its application to identity-related evidence. Specifically, the Government contends that the social costs of applying the exclusionary rule to identity-related evidence in an 8 U.S.C. § 1326 prosecution are too high given the likely deterrence value.

In 2006 the Supreme Court applied the balancing test the Government urges us to engage in today. The Court was considering whether the exclusionary rule

---

[5]The Fourth, Tenth, Ninth, and Eighth Circuits have also held that *Lopez-Mendoza* addressed a jurisdictional challenge, not an evidentiary challenge, and thus any language suggesting that identity-related evidence is not suppressible is mere dictum. *United States v. Oscar-Torres*, 507 F.3d 224, 228 (4th Cir. 2007); *United States v. Olivares-Rangel*, 458 F.3d 1104, 1111 (10th Cir. 2006); *United States v. Garcia-Beltran*, 389 F.3d 864, 866-67 (9th Cir. 2004); *United States v. Guevara-Martinez*, 262 F.3d 751, 754-55 (8th Cir. 2001).

should apply to knock-and-announce violations[6] in criminal prosecutions. *Hudson v. Michigan*, 547 U.S. 586, 126 S. Ct. 2159 (2006). In *Hudson*, the Court held that the exclusionary rule is "applicable only where its remedial objectives are thought most efficaciously served – that is, where its deterrence benefits outweigh its substantial social costs." *Id.* at 591, 126 S. Ct. at 2163 (internal quotations and citations omitted).[7] The Court then analyzed whether the exclusionary rule applied to knock-and-announce violations by weighing the social costs of the application of the rule against the benefit of deterring constitutional violations. *Id.* at 594-599, 126 S. Ct. at 2165-68.

As *Hudson* is a recent application of the cost-benefit balancing test to determine whether the exclusionary rule applies in criminal cases, we discuss briefly how the Court applied the test before applying it in the case before us.

The *Hudson* Court first analyzed the social costs of excluding evidence obtained as a result of a knock-and-announce violation. *Id* at 594-95, 126 S. Ct. at

---

[6]A knock-and-announce violation occurs when the police, in executing a warrant allowing them to enter a house, do not announce their presence and allow the residents an opportunity to open the door.

[7]Most recently, the Supreme Court held that the exclusionary rule did not apply when the police made an unconstitutional arrest on account of negligent miscommunication in recalling a warrant. *Herring v. United States*, 555 U.S. __, __ S. Ct. __, at *13 (2009). In *Herring*, the Supreme Court held that, in light of its "repeated holdings that the deterrent effect of suppression must be substantial and outweigh any harm to the justice system . . ." the application of the exclusionary rule to constitutional violations caused by mere negligence would not produce deterrence benefits substantial enough to outweigh the costs. *Id.* at *12-13.

2165-66. The Court noted that applying the exclusionary rule to knock-and-announce violations would result in: the exclusion of relevant, incriminating evidence; a flood of litigation attempting to show a knock-and-announce violation; and police officers waiting longer after knocking and announcing their presence, resulting in increased destruction of evidence and violence against officers. *Id.* at 595, 126 S. Ct. at 2165-66.

The Court then turned to examine what benefit application of the exclusionary rule to knock-and-announce violations would have in deterring Fourth Amendment violations. *Id.* at 596, 126 S. Ct. at 2166. First, the Court noted that the deterrence value of the exclusionary rule was dependent upon the incentive of the police to violate constitutional rights. *Id.* For instance, a police officer might be motivated to search a home without a warrant in the hope of obtaining otherwise unobtainable evidence. Application of the exclusionary rule to warrantless searches, therefore, would have a high deterrence value. *Id.* But if a police officer violates the knock-and-announce requirement, he does not obtain any evidence which he does not have a lawful right to obtain. The officer is motivated to violate the knock-and-announce rule so that he can avoid unnecessary violence and the destruction of evidence, not so that he can obtain otherwise unobtainable evidence. *Id.* The application of the exclusionary rule to knock-and-announce violations, however, does not remove the

12

motivations for violating the knock-and-announce rule, and thus is less effective at deterring such violations. *Id.*

The Court then reasoned that knock-and-announce violations could be adequately deterred by the threat of civil suits. *Id.* at 596-98, 126 S. Ct. at 2166-68. Finally, the Court concluded that the increasing professionalism of the police force is itself a deterrent to knock-and-announce violations, as officers who commit violations of others' constitutional rights will not enjoy the same level of career success as those who do not violate others' rights. *Id.* at 598-99, 126 S. Ct. at 2168.

The *Hudson* Court held that the use of the exclusionary rule for knock-and-announce violations was unjustified because the social costs of the exclusionary rule in that case were considerable, while the deterrence benefit was minimal. *Id.* at 599, 126 S.Ct. at 2168.

We now apply the cost-benefit balancing test to the case before us. Specifically, we examine whether the exclusion of identity-related evidence in a criminal prosecution, where the evidence is offered solely to prove the identity of the defendant, is justified on the ground that the deterrence benefit of excluding the evidence outweighs its social costs.

First, we examine the social costs. In *Hiibel v. Sixth Judicial Dist. Court of Nev.*, the Supreme Court stated that, "In every criminal case, it is known and must be

13

known who has been arrested and who is being tried." 542 U.S. 177, 191, 124 S. Ct. 2451, 2461 (2004). Both the court and the Government are entitled to know who the defendant is, since permitting a defendant to hide who he is would undermine the administration of the criminal justice system. For example, a defendant who successfully suppressed all evidence of his identity could preclude consideration of his criminal history, which could give rise to relevant and admissible evidence at trial. And, this would prevent a judge sentencing a defendant from applying any relevant recidivism statutes and Sentencing Guidelines for those with criminal histories. *See* United States Sentencing Guidelines Manual ch. 4, pt. A, introductory cmt. (2008) (Advising longer sentences for repeat offenders because, "To protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered."). It would prevent the prosecution of crimes where an official Government record is necessary to prove one element of a crime, such as possession of a firearm by a felon, 18 U.S.C. § 922(g), or illegal re-entry into the United States, 8 U.S.C. § 1326.[8]

---

[8] Though the application of the exclusionary rule to identity-related evidence has a high social cost in any criminal prosecution, its cost is particularly evident here, in a criminal prosecution for a violation of 8 U.S.C. § 1326. As the Court noted in *Lopez-Mendoza*, Farias-Gonzalez's "presence in this country, without more, constitutes a crime." 468 U.S. at 1047, 104 S. Ct. at 3487. *See United States v. Coeur*, 196 F.3d 1344, 1346 (11th Cir. 1999) (holding that § 1326 violation is ongoing so long as illegal alien is in country and not under arrest for violating § 1326). While the exclusionary rule may let a criminal who has committed a crime go free, the Supreme Court has adamantly maintained that it should not permit an ongoing crime. *Lopez-Mendoza*, 468 U.S. at

Additionally, allowing a criminal defendant to use the exclusionary rule to exclude evidence of his identity achieves the same result as would allowing him to suppress the court's jurisdiction over him. While Farias-Gonzalez does not seek to prevent the court from summoning him before it, he does seek to prevent the Government from showing who he is when he appears before it. If Farias-Gonzalez can suppress the Government's evidence of who he is, then he has accomplished the same thing he would have accomplished had he suppressed the ability of the court to exercise jurisdiction over him. But, the Supreme Court forbade the use of the exclusionary rule to challenge jurisdiction in *Lopez-Mendoza*. To allow the use of the exclusionary rule to exclude evidence of who the defendant is would be a significant social cost.

We turn now to the deterrence benefits in applying the exclusionary rule to identity-related evidence. Like in *Hudson*, there is no evidence at issue here which could not be otherwise obtained without violating the Fourth Amendment. The Constitution does not prohibit the Government from requiring a person to identity himself to a police officer. *Hiibel*, 542 U.S. at 188, 124 S. Ct. at 2459 ("A state law requiring a suspect to disclose his name in the course of a valid *Terry* stop is consistent with Fourth Amendment prohibitions against unreasonable searches and

---

1047, 104 S. Ct. at 3487-88.

15

seizures."). The police can obtain both photographs and fingerprints without conducting a search under the Fourth Amendment. *United States v. Dionisio*, 410 U.S. 1, 14-15, 93 S. Ct. 764, 771-72 (1973) (holding that voice and facial characteristics are exposed to public, and thus not protected by the Fourth Amendment, and that fingerprinting likewise does not constitute a search since it "involves none of the probing into an individual's private life and thoughts that marks an interrogation or search." (*quoting Davis*, 394 U.S. at 727, 89 S. Ct. at 1398)). Thus, it is not the acquisition of the evidence at issue here, but rather an earlier unconstitutional search and seizure that caused what the district court found to be a constitutional violation and triggered the potential application of the exclusionary rule. This case is similar to *Hudson* in that there was no incentive to violate the Fourth Amendment, as the evidence was freely obtainable without implicating the Fourth Amendment.

Additionally, even if a defendant in a criminal prosecution successfully suppresses all evidence of his identity and the charges are dropped, the Government can collect new, admissible evidence of identity and re-indict him. *See United States v. Navarro-Diaz*, 420 F.3d 581, 587-88 (6th Cir. 2005) (collecting cases discussing ability to merely re-indict under § 1326 if fingerprints are suppressed). This is so because identity-related evidence is not unique evidence that, once suppressed,

cannot be obtained by other means. The application of the exclusionary rule to identity-related evidence will have a minimal deterrence benefit, as its true effect will often be merely to postpone a criminal prosecution.

Farias-Gonzalez argues that immigrants will be subject to rampant violations of the Fourth Amendment if identity-related evidence is not suppressible. We disagree. As in *Hudson*, civil suits provide deterrence for searches and seizures that violate the Fourth Amendment. Since identity-related evidence is collectible without implicating the Fourth Amendment, Fourth Amendment violations will only occur when there is an unconstitutional search or seizure  prior to the collection of the identity-related evidence. Thus, officers seeking to obtain identity-related evidence will gain nothing by violating a suspect's constitutional rights in the process of collecting fingerprints and photographs.

As in *Hudson*, the social costs of excluding evidence in this case are great, while the deterrence benefits are minimal. Therefore, we hold that the exclusionary rule does not apply to evidence to establish the defendant's identity in a criminal prosecution, and accordingly, the fingerprint and photograph evidence in this case offered to prove Farias-Gonzalez's identity is not suppressible. The district court did not err in concluding that identity-related evidence is not suppressible.

17

C. The Alien File

Having concluded that the photographs and fingerprints at issue in this case are not suppressible, we turn finally to Farias-Gonzalez's challenge to the admissibility of his alien file, which contains his fingerprints, photograph, and deportation history.

The leading case in this circuit on the suppression of an alien file is *United States v. Martinez*, 512 F.2d 830 (5th Cir. 1975). In *Martinez*, the defendant, who had been arrested lawfully, moved to suppress his alien file when an unlawful interrogation alerted the government to the fact that he might be in the country illegally. *Id.* at 831. The government then searched its I.N.S. files and found the defendant's alien file. *Id.* In *Martinez*, we held that an alien file is not suppressible when the government already knows the identity of the illegal alien and has his alien file in its possession. *Id.* at 832. We reasoned that an I.N.S. alien file was not the product of any unconstitutional activity because it already existed and was located in the records of a government agency. *Id.*

Here, the Government knew the identity of Farias-Gonzalez and had his alien file in its possession. Accordingly, in this case the Government stands on the same footing as the government did in *Martinez*.

Farias-Gonzalez argues that *Martinez* is distinguishable on the ground that no Fourth Amendment violation led to the discovery of Martinez's name and identity,

18

as was the case here. Farias-Gonzalez argues the alien file was discovered only because the police unlawfully obtained Farias-Gonzalez's fingerprints and other identity-related evidence. In light of our holding that identity-related evidence is never suppressible, no constitutional violation present in this case distinguishes it from *Martinez*. Accordingly, the alien file is not suppressible in this case.

## V. CONCLUSION

Because we hold that the fingerprints, photographs, and alien file of Farias-Gonzalez are not suppressible in this case, we affirm the order of the district court denying in part Farias-Gonzalez's motion to suppress.

AFFIRMED.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By:_____
Deputy Clerk
Atlanta, Georgia

19